**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

---

**F & C FLOORING DISTRIBUTORS, INC.,**
        **Plaintiff,**

    v.                                                          Case No. 08C0249

**JUNCKERS HARDWOOD, INC.,**
        **Defendant.**

---

## DECISION AND ORDER

### I. BACKGROUND

Plaintiff F&C Flooring Distributors, Inc. brought this action in state court alleging that defendant violated the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135.01 et seq. Defendant removed the case based on diversity of citizenship. Plaintiff is a Wisconsin corporation, and its principal place of business is Wisconsin. Defendant is a Delaware corporation, and its principal place of business is New York. Defendant now moves for summary judgment.

Plaintiff distributed hardwood floors manufactured by defendant. It also distributed floors and floor-related products of other manufacturers as well as its own line of floors and floor-related products. Plaintiff commenced distributing defendant's products in 2004. In late 2006 defendant downsized it business, and plaintiff subsequently became dissatisfied with the level of service defendant provided. By the end of 2008, the parties' relationship had for the most part ended. I will discuss the parties' relationship in more detail in the course of this opinion.

In evaluating defendants summary judgment motion, I take all facts and all reasonable inferences therefrom in the light most favorable to plaintiff and I will grant the motion only if I conclude that no reasonable fact-finder could find for plaintiff.

## II. DISCUSSION

The parties disagree as to whether the WFDL governed their relationship. Defendant contends that plaintiff was not a "dealer" within § 135.02(2). Under § 135.02(2) a dealer is "a person who is a grantee of a dealership situated in this state." A dealership is comprised of: "(1) a contract or agreement; (2) which grants the right to sell or distribute goods or services, or which grants the right to use a trade name, logo, advertising or other commercial symbol; and (3) a community of interest in the business of offering, selling or distributing goods or services." Central Corp. v. Research Prods. Corp., 272 Wis. 2d 561, 580 (2004). Defendant's primary contention is that the parties did not share a community of interest within the meaning of the statute.

Wis. Stat. § 135.02(1) defines "community of interest" as a "continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods and services." The Seventh Circuit has characterized this definition as "vague and unhelpful." Frieberg Farm Equip., Inc. v. Van Dale, Inc., 978 F.2d 395, 398 (7th Cir. 1992). Generally, the entities that the legislature intended to protect are those which have the characteristics of a typical dealer, such as a fast-food franchise or gasoline service station. Wilburn v. Jack Cartwright, Inc., 719 F.2d 262, 264-65 (7th Cir. 1983); Bush v. Nat'l Sch. Studios, Inc., 139 Wis. 2d 635, 647 (1987). The legislature did not intend to protect entities involved in typical "vendor-vendee" relationships. Central Corp., 272 Wis. 2d at 581; Kania v. Airborne Freight Corp., 99 Wis. 2d 746, 768-69 (1981).

2

However, courts have not established a bright-line rule distinguishing the relationships that the legislature intended to protect from those it did not, Bush, 139 Wis. 2d at 647, and the Wisconsin Supreme Court has rejected "any rigid tests that would exclusively rely on percentages," Central Corp., 272 Wis. 2d at 581.

Rather, in determining whether parties shared a community of interest, the state supreme court has established two guideposts: first, whether the parties shared a continuing financial interest in the operation of the dealership or the marketing of a good or service, id.; Bush, 139 Wis. 2d at 654-55; and second, whether the parties were interdependent, i.e., "the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship," Central Corp., 272 Wis. 2d at 581 (quoting Ziegler Co., Inc. v. Rexnord, Inc., 139 Wis. 2d 593, 605 (1987)). "When construed together, these guideposts must reveal an interest in a business relationship great enough to threaten the financial health of the dealer, if the grantor were to decide to exercise its power to terminate." Id.

A dealer's financial health is threatened if termination would cause it to sustain a "significant economic impact." Ziegler, 139 Wis. 2d at 605. To determine whether termination would cause a significant economic impact, a court must consult "all facets of the business relationship, as reflected in the parties' actual dealings, and [must] not limit . . . the inquiry to one deficient factor." Central Corp., 272 Wis. 2d at 581. To this end, the Wisconsin Supreme Court has compiled a non-exhaustive list of such facets:

> [H]ow long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's

3

products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's propriety marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

Ziegler, 139 Wis. 2d at 606. These facets "may be distilled into two highly important questions in establishing a community of interest: (1) the percentage of revenues and profits the alleged dealer derives from the grantor and (2) the amount of time and money an alleged dealer has sunk into the relationship." Home Protective Servs., Inc. v. ADT Security Servs., Inc., 438 F.3d 716, 720 (7th Cir. 2006). In any event, "the ultimate question is whether the grantor has the alleged dealer 'over a barrel' – that is, whether it has such great economic power over the dealer that the dealer will be unable to negotiate with the grantor or comparison-shop with other grantors." Id.

Turning to the present case and taking the evidence and all reasonable inferences therefrom in the light most favorable to plaintiff, I conclude that no reasonable fact-finder could find that defendant had plaintiff over a barrel. Simply put, defendant was not in a position to exploit plaintiff such that the parties had a community of interest. I reach this conclusion for two principal reasons. First, plaintiff derived only a small percentage of its total profits from the distribution of defendant's products; and second, plaintiff sunk a relatively modest amount of time and money into its relationship with defendant.

With respect to revenues and profits, plaintiff generated only slightly more than five percent of its gross profits in 2006 from the distribution of defendant's products, less than

4

two percent in 2007 and slightly over three percent in 2008. Single digit figures such as these indicate that defendant did not have plaintiff over a barrel. Plaintiff claims that revenue generated from the sale of defendant's flooring represented roughly twenty-five percent of its total sales of hardwood flooring, but this figure is misleading because it ignores the fact that plaintiff derived substantial profits from aspects of its business other than sales of hardwood flooring, i.e., sales of engineered flooring, unfinished flooring and accessories. Thus, plaintiff did not generate sufficient profits from sales of defendant's products to cause the loss of defendant as a supplier to constitute a threat to plaintiff's financial health.

Plaintiff argues that defendant's product was unique in the marketplace and "opened many doors" for it. (Flagstad Decl. ¶ 6.) However, although defendant's product may have been unique and generated sales that plaintiff otherwise would not have made, the record does not allow a reasonable fact-finder to conclude that defendant's product was such a cornerstone of plaintiff's business that the loss of the product put plaintiff's financial health in jeopardy. Plaintiff has not, for example, offered evidence showing that the loss of Junckers flooring will translate into drastically reduced sales in plaintiff's other product lines. Indeed, although plaintiff states that Junckers "opened many doors," all the new business was sales of Junckers products, not an increase in sales of other lines as a result of using Junckers to get in the door. (See Flagstad Decl. ¶¶ 6-8, 17.) Thus, plaintiff has not shown that the loss of Junckers will cause the profits generated by its other lines to evaporate.

With respect to sunk costs, plaintiff's unrecoverable investment in defendant's product line was not so significant that it allowed defendant to behave opportunistically.

5

The business relationship between the parties was of relatively short duration, commencing in 2004 and ending in 2008. Although for part of this relationship some of plaintiff's employees may have spent as much as twenty-five percent of their time on the distribution of defendant's products and received training specific to defendant's products, none of plaintiff's employees worked solely on business involving defendant's products. Nor did plaintiff invest a substantial sum of unrecouped funds into the relationship. At the beginning of the relationship, plaintiff was required to purchase $120,000 worth of defendant's inventory and about $45,000 worth of displays. However, plaintiff sold all of the initial inventory, purchased and sold additional inventory, and has only about $24,000 of unsold inventory remaining, which it will likely be able to sell. Further, the useful life of most (if not all) of the displays plaintiff initially purchased ended prior to the filing of this lawsuit. Plaintiff voluntarily purchased $45,000 in additional displays in 2004, about $40,000 in 2005, $9,400 in 2006, and $2,100 in 2007. It also invested minimally in business cards, brochures and the like. However, many of these expenses have likely been recouped in the form of sales of defendant's products.

To be sure, a reasonable fact-finder could find that plaintiff has not recouped all of its brand-specific investments. However, no reasonable fact-finder could conclude that the unrecouped investments were so substantial that they enabled defendant to hold plaintiff over a barrel. It is not as though plaintiff has been left with substantial unsaleable inventory or unusable buildings, as a fast food franchisee might be. See Home Protective Services, 438 F.3d at 720. Nor has plaintiff been selling Junckers products at a loss in an effort to build a market, only to have Junckers pull the rug out from under it just as the line was beginning to look profitable. Although plaintiff points out that its profit margin on sales of

Case 2:08-cv-00249-LA    Filed 12/04/09    Page 6 of 7    Document 55

Junckers products was tight, plaintiff has not submitted evidence from which a reasonable fact-finder could conclude that this margin was significantly tighter than on plaintiff's other product lines. Plaintiff stresses that it paid higher freight costs in connection with Junckers' products during the time that it was developing the market, but again, there is no indication that this was such a substantial investment that it put plaintiff over a barrel. (See Flagstad Decl. ¶ 11.) Indeed, plaintiff does not even quantify these additional freight costs.

In short, plaintiff undoubtedly benefitted from selling defendant's products and suffered from its changed relationship with defendant. However, the community of interest standard is a relatively demanding one and, as discussed, the record does not support plaintiff's assertion that defendant had it over a barrel. Thus, no reasonable fact-finder could conclude that the relationship between the parties involved a community of interest, and accordingly, no dealership existed within the meaning of the WFDL.

**THEREFORE, IT IS ORDERED** that defendant's motion for summary judgment is **GRANTED**. The Clerk of Court shall enter a final judgment.

Dated at Milwaukee, Wisconsin, this 4 day of December, 2009.

/s_____
LYNN ADELMAN
United States District Judge

7

Case 2:08-cv-00249-LA    Filed 12/04/09    Page 7 of 7    Document 55